**COMP**
COLTON J. WILSTEAD, ESQ.
Utah Bar No. 18254
**DEAVER|CRAFTON**
150 N. 200 E., Ste. 100
St. George, UT 84770
Cole@deavercrafton.com
Tel. (702) 385-5969
Fax. (702) 385-6939

*Attorneys for Plaintiff,*
*McKenzie Keller*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| McKenzie Keller, | Case No. |
|     Plaintiff, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Delquan Maurice Danford a/k/a "Greezy"; Extended Stay America, Inc.; ESA P Portfolio L.L.C.; ESA P Portfolio Operating Lessee LLC;  Red Lion Hotels Corporation; Sonesta International Hotels Corporation; WHC816, LLC; RL Salt Lake, LLC; Choice Hotels International, Inc.; Salt Lake Lodging, LLC; CRRC Properties, LLC | |
|     Defendant. | |

### PARTIES

1.     Plaintiff MCKENZIE KELLER ("**McKenzie**") is a natural person residing in Clark County, NV.  Plaintiff originally declared her intent to proceed under a pseudonym.  Her trafficker has since been convicted and imprisoned, so she has decided to proceed under her true name.

2.     Defendant DELQUAN MAURICE DANFORD a/k/a "GREEZY" ("**Delquan**") is a natural person and convicted human trafficker residing in the Central Utah Correctional Facility

in Gunnison, Utah.  His offender number is 268636.

3.    Defendant EXTENDED STAY AMERICA, INC. ("**ESA**") is a Delaware corporation with its principal place of business in Mecklenburg County, NC.  On reference, at all relevant times ESA was the franchisor that set—and monitored compliance with—the brand standards for the Extended Stay America – SLC Sugarhouse hotel, located at 1220 E. 2100 S., Salt Lake City, UT 84106 (the "Sugarhouse ESA").  On information and belief, at all relevant times ESA was also the sole owner and corporate parent of ESA Operating and ESA Portfolio, and it controlled their operations for its benefit and without regard for formalities to a degree inconsistent with corporate separateness.

4.    Defendant ESA P PORTFOLIO OPERATING LESSEE LLC ("**ESA Operating**") is a North Carolina limited liability company with its principal place of business in Mecklenburg County.  On information and belief, ESA Operating ran the Sugarhouse ESA at all relevant times.

5.    Defendant ESA P PORTFOLIO L.L.C. ("**ESA Portfolio**") is a North Carolina limited liability company with its principal place of business in Mecklenburg County, NC.  On reference, ESA Portfolio owns the Sugarhouse ESA.  On information and belief, ESA Portfolio owned the Sugarhouse Extended Stay at all relevant times.  On information and belief, if ESA Operating did not operate the Sugarhouse ESA, then ESA Portfolio did so at all relevant times.

6.    Defendant RED LION HOTELS CORPORATION ("**Red Lion**") was a Washington Corporation with its principal place of business in Denver County, CO. On reference, at all relevant times "Red Lion" was the franchisor that set—and monitored compliance with—the brand standards for the – Red Lion hotel, located at 161 W. 600 S., Salt Lake City, UT 84101 (the "SLC Red Lion").

7.    Defendant SONESTA INTERNATIONAL HOTELS CORPORATION ("**Sonesta**") is a Maryland corporation with its principal place of business in Baltimore County,

DEAVER | CRAFTON
ATTORNEYS AT LAW

MD. On information and belief, Red Lion was sold to Sonesta in 2022, and as part of that transaction Sonesta assumed Red Lion's liabilities.

8. Defendant WHC816, LLC ("**WHC**") is a Delaware limited liability company with its principal place of business in Spokane County, WA, owned—and, on information and belief, operated—the Red Lion hotel located at 161 W. 600 S., Salt Lake City, Utah 84101 (the "SLC Red Lion") until approximately 2015.

9. Defendant RL SALT LAKE, LLC ("**RL SLC**") is a Delaware limited liability company with its principal place of business in Spokane County, WA, owned—and, on information and belief, operated—the SLC Red Lion from approximately 2015 until the end of the period relevant to this suit.

10. Defendant CHOICE HOTELS INTERNATIONAL, INC. ("**Choice**") is a Delaware corporation with its principal place of business in Montgomery County, MD. On reference, at all relevant times "Choice Hotels" was the franchisor that set—and monitored compliance with—the brand standards for the Quality Inn hotel, located at 616 S. 200 W., Salt Lake City, UT 84101 (the "Downtown Quality Inn").

11. Defendant CRRC PROPERTIES, LLC ("**CRRC**") is a Utah limited liability corporation with its principal place of business in Salt Lake County, UT owned—and on information and belief, operated—the Downtown Quality Inn until approximately 2015.

12. Defendant SALT LAKE LODGING, LLC ("**Salt Lake Lodging**") is a Utah limited liability corporation with its principal place of business in Salt Lake County, UT owned—and, on information and belief, operated—the Downtown Quality Inn from approximately 2015 until the end of the period relevant to this suit.

13. Defendants **ESA Operating**, **ESA Portfolio**, **WHC**, **RL SLC**, **CRCC**, and **Salt Lake Lodging** are sometimes referred to collectively hereinafter as the "**Hotel Operator**

**Defendants**."

14.    Defendants **ESA**, **Red Lion**, and **Choice** are sometimes referred to collectively hereinafter as the "**Hotel Franchisor Defendants**."

15.    Defendants acted through their agents, employees, officers, members, directors, heirs, successors, assigns, principles, trustees, sureties, subrogees, representatives, and insurers at all times relevant to this action.

### INTRODUCTION
<u>Pimpology</u>

16.    One doesn't have to be chained up to be trapped in prostitution.  As most people recognize, women involved in prostitution nearly always feel trapped in a life they want to escape.[1]

17.    Despite this, in the popular imagination "sex trafficking" is something completely different from prostitution—something that only happens to sympathetic women.  In popular depictions of sex trafficking, the victim is nearly always a respectable girl from a good home who has been kidnapped off the street and who has been forced to sell her body solely by violence and the threat of violence..

18.    But, "[t]his popular image of sex traffickers and the victims of sex trafficking is almost completely wrong . . .  About the only thing Hollywood gets right is the brutal men, and even that is more complicated."[2]

19.    Most victims of sex trafficking aren't cuddly, and many are not obviously victims.  Few trafficking victims cry for help, because few see themselves as needing help.  Most are street

---

[1] Rachel Moran & Melissa Farley, Consent, Coercion, and Culpability: Is Prostitution Stigmatized Work or an Exploitative and Violent Practice Rooted in Sex, Race, and Class Inequality?, 48 Archives of Sexual Behavior 1950-51 (2019).

[2] BRIAN JOSEPH, VEGAS CONCIERGE: SEX TRAFFICKING, HIP HOP, AND CORRUPTION IN AMERICA XII (2024).

savvy and tough as nails.  Many are flaky or personally difficult.  Nearly all have a wealth of past

traumas, and it is usually those past traumas that make them vulnerable to exploitation.

20.    No little girl dreams of becoming a prostitute.  Most girls who do become

prostitutes are coerced into it, and even those who aren't coerced at first usually suffer coercion

later.[3]  Nearly half are still children when they turn their first trick.[4]

21.    The individual risk factors for both "consensual" prostitution and sex trafficking

overlap almost completely, including in both cases PTSD, trauma, childhood abuse and neglect,

substance abuse, poverty and housing instability, foster care or dysfunctional family dynamics.[5]

22.    Regardless of how they got into the sex trade, most women who work as prostitutes

are not working for themselves. Figures vary, but studies of prostitution in the U.S. find that 80-

90% of prostitutes are controlled by pimps.[6]

23.    The sex traffickers who exploit these women and girls call themselves pimps, but

that is a distinction without a difference—the great majority of pimps use threats and physical

violence to keep their "stable" of girls hardworking and loyal.[7]

24.    And physical violence is not the pimp's only tool of coercion.  As Ken Ivy, a

Milwaukee pimp, explains in his startlingly explicit book *Pimpology: The 48 Laws of the Game*,

---

[3] *See* Jody Raphael, Jessica Alice Reichert & Mark Powers, *Pimp Control and Violence: Domestic Sex Trafficking of Chicago Women and Girls*, 20 WOMEN & CRIMINAL JUSTICE 89, 96 (2010) (coercion increases greatly with time).

[4] Melissa Farley et al., *Prostitution and Trafficking in Nine Countries: An Update on Violence and Posttraumatic Stress Disorder*, 2 JOURNAL OF TRAUMA PRACTICE 40 (2004) (42% of prostitutes in the U.S. started as children).

[5] Lara Gerassi, *From Exploitation to Industry: Definitions, Risks, and Consequences of Domestic Sexual Exploitation and Sex Work Among Women and Girls,* 25 JOURNAL OF HUMAN BEHAVIOR IN THE SOCIAL ENV'T 591-605 (2015).

[6] Farley, Melissa et al., *Online Prostitution and Trafficking,* ALBANY LAW REVIEW, 1039 (2014), *available at* albanylawreview.org/article/70164-onlineprostitution-and-trafficking (collecting studies).

[7] Jody Raphael, Jessica Alice Reichert & Mark Powers, *Pimp Control and Violence: Domestic Sex Trafficking of Chicago Women and Girls*, 20 WOMEN & CRIMINAL JUSTICE 89, 96 (2010) (finding over 75% of pimp-controlled prostitutes said their pimps physically abused them, and under half said they could leave without physical harm); *See also* C. Williamson & T. Cluse-Tolar, *Pimp-controlled prostitution: Still an integral part of street life.* 8 VIOLENCE AGAINST WOMEN 1085 (2002) ("The extent to which women felt threatened by a pimp was, in part, a function of her evaluation of the likelihood that he will become physically violent.  This threat had been realized by all of the women in the study.").

pimps are also master manipulators, ready to ferret out the weaknesses and pressure points left by a girl's past traumas and use them to create dependence:

> Most hoes have low self-esteem for a reason. A pimp looks for that weakness, and if it isn't on the surface, he brings that motherfucker out of them. . . . Weakness is the best trait a person can find in someone they want to control. You have to tear someone's ego down to nothing before they will start looking to you for salvation.[8]

25.     As those familiar with "the Life" know, "most hoes don't even like sex."[9] Rather, they are usually in desperate situations and dealing with unresolved traumas that make them susceptible to manipulation and coercion by pimps who seek them out and purport to provide them with the love, care, and security that they've been deprived of.

26.     Still, even non-violent pimps leverage the ever-present threat of other pimps' violence to help coerce women they suspect of being independent sex workers—"renegades," in the language of the Life—into "choosing up" and becoming *their* girls.

27.     In his book, Mr. Ivy—a self-proclaimed non-violent pimp—recalls taking control of a naïve sex worker who made the mistake of speaking to him by telling her: "A solo ho without a pimp will soon be under pimp arrest or worse. It's in your best interest to choose a pimp. It's in your best interest to choose Pimpin' Ken."[10]

28.     It is standard practice for pimps to take all, or nearly all, of the money earned by the women and girls they control. The pimps then use the money to pay for their victims' needs, but only as and when it suits them. This creates total dependence, both practical and psychological, on the pimp.[11]

---

[8] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 22 (2008) ("Law 5: Prey on the Weak").
[9] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 77 (2008).
[10] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 79 (2008).
[11] *See* Johnson, Matthew and Dank, Meredith, *The Hustle: Economics of the Underground Commercial Sex Industry*, URBAN INSTITUTE (2014), *available at* https://apps.urban.org/features/theHustle/index.html.

29.     To quote Ken Ivy again, "The more someone depends on you, the more power you have over them. To master someone completely, they have to depend on you for everything."[12]

30.     Common control techniques include retaining control of victims' identification documents, telling stories about the horrible fates suffered by girls who disobeyed other pimps, and threatening to have CPS separate victims from their children if they disobey.

31.     Other methods of coercion include withholding food, sleep deprivation, and induced substance abuse/drug addiction. Courts have long recognized these tactics to be methods of coercion used in human trafficking.

32.     As Justice William J. Brennan explained, "drug addiction or the weakness resulting from a lack of food, sleep, or medical care . . . would not reappear with such depressing regularity [in trafficking cases] if they were ineffective." *United States v. Kozminski*, 487 U.S 931, 957 (Brennan, J., concurring) (collecting cases).

33.     Traffickers use substances to keep their victims too physically incapacitated to resist and to create a physical reliance on the trafficker out of fear of withdrawal.[13] Most sex trafficking victims—up to 84% according to one study—report their trafficker used substances to exploit them during their victimization period.[14]

34.     Of course, pimps use carrots as well as sticks.  Extravagant promises of comfortable retirement are nearly universal, as are shorter-term promises of nice clothes, jewelry, and the like.  But follow-through on even the short-term promises is rare, and retirement is all but unheard of.

---

[12] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 20 (2008).
[13] Planty L. Langton et al, *Sex Trafficking and Substance Use: Identifying High-Priority Needs Within the Criminal Justice System,* 9 RAND HEALTH QUARTERLY 14 (2022).
[14] Eastwood-Paticchio, Emma, *Addicted to You: Drug Addiction as a Means of Coercion*, HUMAN TRAFFICKING INSTITUTE (30 January 2019), *available at* https://traffickinginstitute.org/addicted-to-you-drug-addiction-as-a-means-of-coercion/ (noting prevalence of induced substance use in various human trafficking surveys and reports).

35.    Still, many victims cling to their pimps' fraudulent promises out of a desperate need for something to hope for when all other happy endings seem closed to them.

36.    Many victims are also desperate to be loved.

37.    A "Romeo pimp" is a sex trafficker who deliberately feigns love and emotion connection to manipulate and control their victims. They knowingly misrepresent the nature of the relationship to induce victims into commercial sexual activity under false pretenses.

38.    Notably, these false promises of love, marriage, and retirement are just some of the many tools in a pimp's toolbox. They are not mutually exclusive from—and usually operate in tandem with—other methods of force, fraud, and coercion often including physical violence.

39.    All told, very few prostitutes who find themselves answering to a pimp feel able to leave without suffering some disastrous combination of physical, emotional, reputational, and financial consequences. On reference, for more than half of all prostitutes these potential consequences rise to the level of "serious harm" as defined in 18 U.S.C. § 1591(e)(5).

40.    For most women living it, the life of a pimp-controlled prostitute is a hellish prison from which escape seems not just impossible, but unthinkable.  Contrary to the popular image, pimp-controlled prostitution is what sex trafficking looks like in America today.

41.    Fortunately, federal law recognizes this complex reality.  The Trafficking Victims Protection Reauthorization Act ("TVPRA"), at 18 U.S.C. § 1591, defines a human trafficker as:

> Whoever knowingly . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . knowing, or . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act.

42.    "Coercion," as used in the statute's definition of human trafficking, includes:

> threats of serious harm to or physical restraint against any person; [or] any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm or physical restraint against any person.

43.    "Serious harm," as used in the statute's definition of coercion, means:

> Any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

44.    Reading the TVPRA's criminal provision together with its incorporated definitions, human trafficking means using (or recklessly disregarding the use of) force, fraud, or threats of "any harm" that would be "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person *of the same background and in the same circumstances* . . . to continue performing commercial sexual activity."

45.    Contrary to the comfortable myth spread by those who benefit from prostitution occurring on their properties, there is no way to welcome any degree of "consensual prostitution" without welcoming an even greater degree of sex trafficking.

46.    This is because the vast majority of American prostitutes—on reference, at least three-quarters—are victims of sex trafficking within the meaning of the TVPRA.

47.    In recent years, many American law enforcement agencies have "overhauled their approach to prostitutes, trying to be more respectful and compassionate in their interactions with them while still enforcing prostitution laws, recognizing all prostitutes are victims, and putting a greater focus on identifying and arresting their pimps."[15]

48.    However, people other than police, prosecutors, and victim advocates think of the average prostitute as a human trafficking victim, but that failure isn't because most people are ignorant of the relevant facts.  After all, the phrase "pimp slap" didn't enter the lexicon because

---

[15] BRIAN JOSEPH, VEGAS CONCIERGE: SEX TRAFFICKING, HIP HOP, AND CORRUPTION IN AMERICA 35 (2024).

people think pimps are cuddly and supportive.

49.     Rather, most people fail to see prostitutes as victims because judgmental attitudes toward prostitutes—and dismissive attitudes toward their suffering—are deeply rooted in popular culture.  In other words, most people know prostitutes are usually coerced, they just don't care.

50.     In this case, McKenzie spent roughly four years under the control of a single trafficker who beat her constantly, threatened to separate her from her children, and insisted on controlling every penny she earned so that she remained totally dependent on him.

51.     Sadly, McKenzie's story is far from unique—most prostitutes are subjected to similarly coercive treatment.  As will be shown in the next section, casinos and casino workers have long been intimately familiar with the sex industry.  They *know* most prostitutes are victims like McKenzie.

<u>Hospitable to Trafficking</u>

52.     Hotels often knowingly profit from sex trafficking.

53.     By their nature, hotels tend to be located in close proximity to event spaces, airports and highways.  They offer temporary, anonymous, private, and cost-effective lodgings that are convenient for busy travelers.

54.     The same factors also make them prime venues for human trafficking.

55.     According to a 2018 Polaris Project report, three quarters (75%) of sex trafficking victims surveyed had spent time in a hotel during their trafficking, and four fifths of victims who spent time in a hotel (i.e. 60% of all victims) had engaged in commercial sex inside of a hotel.

56.     Similarly, as of 2020, among all active federal prosecutions for human trafficking involving a completed sex act, over three quarters (77%) involved commercial sex at a hotel.

57.     As a result, hotel employees encounter victims of sex trafficking far more often

than members of the general public.

58.    The hotel industry is aware, and has long been aware, that this problem runs rampant behind its guestroom doors.

**59.**    Sex trafficking is a problem that could not exist—not on anything like the same scale, at least—absent the willing cooperation of the hospitality industry, in whose rooms the great majority of the victims' suffering occurs.

**BACKGROUND**

McKenzie's Trafficking Begins

60.    By 2010, when McKenzie was 21 years old, she was a single mother was working two jobs to keep her daughter fed, clothed, and housed.

61.    Unfortunately, in about 2012 she started dating a man named Delquan Danford. The relationship was controlling and abusive from early in its existence, with Delquan frequently helping himself to money McKenzie had earned working as a dancer.

62.    Around the time McKenzie's second daughter was born in August of 2013, Delquan borrowed McKenzie's car for a work commute and fell asleep on the drive home, crashing it.

63.    This was a turning point in the relationship.  Delquan decided he was tired of working, so he quit his jobs and demanded that McKenzie support him.

64.    When McKenzie's insurance paid out for the damage to her car, he forced her to hand over the entire check to him.

65.    Unsatisfied with the life McKenzie could provide for him through legitimate employment, Delquan followed the advice of one of his cousins, who was an experienced pimp, and forced McKenzie to sell her body to support his habits.

66.    Delquan used a variety of coercive methods to force McKenzie to engage in commercial sex for his benefit.  He beat McKenzie regularly when she displeased him.  He carried guns and used them to threaten McKenzie.  He threatened to take McKenzie's children from her, or to report her to Child Protective Services ("CPS") so that CPS would take her children.

67.    Delquan was a sophisticated abuser. On the advice of his cousin, he deployed a mix of promises and threats, love bombs and beatings, to build a cage around McKenzie's mind.

68.    At first, Delquan forced McKenzie to bring home a nightly "trap" of $500.  Over time, his demands increased until McKenzie had to bring home $1,000 per night to avoid punishment.  Sometimes punishment meant emotional manipulation, but often it meant beatings.

69.    Delquan would post online ads offering McKenzie for commercial sex.  To keep McKenzie obedient, he would sometimes print the ads and threaten to show them to her family.

70.    Delquan also insisted on controlling every penny McKenzie earned, forcing her into a state of total dependence on him for even the most basic necessities.

71.    Soon after forcing her into prostitution, Delquan and his cousin took McKenzie to a tattoo parlor, where Delquan forced McKenzie to have his street name "Greezy" tattooed in large letters on her left forearm.  Throughout McKenzie's trafficking, this "brand," as such tattoos are known in the Life, was conspicuously visible to anyone she interacted with.

72.    Branding is commonly used by pimps both to advertise and to reinforce their control over their victims.  In particular, brands serve to put other pimps on notice that their bearers already belong to someone.

73.    For nearly four years beginning in 2012, Delquan forced McKenzie to have sex with as many as ten men per day, almost every day.

74.    Delquan primarily forced McKenzie to walk the carpets inside casinos on the Las Vegas strip, but sometimes he would fly her to Salt Lake City, Utah, and force her to sell herself

from hotel rooms in those locations.

75.    When he sent McKenzie to other cities, Delquan would often remain behind in Las Vegas, keeping her children with him.  Delquan used her children as a lever to control her, both when they were together in Las Vegas and when he forced her to travel and leave them behind.

76.    Delquan would sometimes force McKenzie's children to call her and tell her that she was never going to see them again.

77.    On one occasion in 2015, McKenzie had an unsuccessful night looking for johns in the Rio.  Eventually, she gave up and headed home around five o'clock in the morning. When she got there, she found Delquan in her bed with another woman.

78.    When McKenzie told the other woman to leave, Delquan beat McKenzie into unconsciousness. When she regained consciousness, Delquan strangled her to the point that one of his friends staying in the home pulled away him, yelling, "You're going to kill her!"

79.    Around this time, Delquan became sure enough of his control over McKenzie— and unhappy enough with the burdens of childcare—that he handed McKenzie's children over to her mother (the children's grandmother).

80.    With that development, it became possible for McKenzie to contemplate escape, but it was not until an incident in 2016, in which McKenzie was nearly murdered by a john, that McKenzie's fear of the results of obeying Delquan finally outweighed her fear of disobeying him.

81.    McKenzie escaped Delquan's control for good in about April of 2016.

82.    As she came to terms with what she had been through, McKenzie began to seek justice against Delquan for what he'd put her and her children through.

83.    She approached the LVMPD vice squad first, but it had no interest in prosecuting Delquan because prosecuting pimps is more work than prosecuting their victims, because prosecuting pimps distracts from their primary mission of protecting the casinos, and because

DEAVER | CRAFTON
ATTORNEYS AT LAW

LVMPD vice lost its taste for prosecuting pimps following their catastrophic mishandling of cases against, *inter alia*, Jamal Rashid and Ocean Fleming.

84.     Fortunately, the authorities in Utah are made of sterner stuff.  They secured Delquan's extradition to Utah, where he pleaded guilty charges of aggravated assault and human trafficking.  He is now serving a sentence of up to 20 years in prison.

85.     McKenzie still suffers the physical and emotional aftereffects of this and other attacks, as well as of being forced to have sex with thousands of strange men during the years she was trafficked.

<u>McKenzie's Trafficking in Salt Lake City</u>

86.     In addition to forcing McKenzie to walk the carpet in Vegas, Delquan periodically sent McKenzie to Utah and Colorado to do "in calls" in hotels.  An "in call" is when a customer comes to a sex worker's location—usually a hotel room—for commercial sex.

87.     To do this, Delquan would purchase plane tickets for McKenzie and send her to another state while keeping her children in Las Vegas.

88.     McKenzie stayed at and was sold for sex in the SLC Red Lion, the Sugarhouse ESA, and the downtown Quality Inn in Salt Lake City, Utah on many occasions in 2014 and 2015.

89.     On her first trip to Salt Lake City, Delquan stayed with McKenzie at the Quality Inn for several days.  Additionally, McKenzie stayed at the Quality Inn and was sold for sex there on about three later occasions.  In total, she spent approximately one to two weeks living in and being sold for sex out of the Quality Inn.

90.     On a later trip to Salt Lake City, Delquan forced her to stay in, and sell sex out of, the Sugarhouse ESA for three weeks straight, encompassing Christmas and New Year's.  This was by far the most common location where McKenzie was trafficked in Salt Lake City, and in

total she lived in and was sold for sex out of the Sugarhouse ESA for about 4 months in 2014 and 2015.

91.     On other later trips to Salt Lake City, Delquan forced her to stay in, and sell sex out of, the SLC Red Lion.  In total, McKenzie spent at least a month living in and being sold for sex out of the SLC Red Lion.

92.     At the SLC Red lion, McKenzie developed a friendship with a security guard named Ryan Smith.  The two spoke with increasing frequency across McKenzie's repeated stays, and Mr. Smith noticed and mentioned the bruises Delquan had given McKenzie on more than one occasion.  McKenzie eventually confided in him that her man (Delquan) beat her.

93.     Mr. Smith also knew that McKenzie was staying at the SLC Red Lion to sell commercial sex.  Given his position, their regular conversations, and the steady stream of strange men going in and out of her hotel room, Mr. Smith could hardly have remained ignorant.  And the way he spoke to McKenzie strongly implied his knowledge of the reason for her repeated stays.

94.     Mr. Smith thus knew that McKenzie was a sex worker under the control of a physically abusive man.  He knew, or at the very least should have known, that she was being trafficked for commercial sex.

95.     Nevertheless, Mr. Smith never attempted to intervene, and the SLC Red Lion continued to provide shelter and concealment for McKenzie's trafficking in exchange for room rental fees paid out of the proceeds of such trafficking.

96.     On information and belief, Mr. Smith reported his belief that McKenzie was being trafficked to on-site management at the SLC Red Lion, and he did so both before and after the franchisee changeover in 2015 between WHC and RL SLC.

97.     On information and belief, Mr. Smith's belief was reported to the franchisor, Red

Lion, by on-site management.  In the alternative, Mr. Smith's suspicions were not reported to Red Lion because Red Lion had an explicit or implicit policy of discouraging the reporting of indications of sex trafficking.

98.    On information and belief, Mr. Smith's failure to intervene was driven by a corporate policy, originating with Red Lion and followed by WHC and RL SLC, against interfering in human trafficking unless the trafficking triggered complaints from other guests.

99.    In the alternative, Mr. Smith's failure to intervene was directly commanded by his supervisors, who were acting in accordance with training and instruction from Red Lion.

100.    McKenzie had a routine for how she operated while working for Delquan in Salt Lake City, Utah.  On each occasion when she stayed in Salt Lake City, she would:

 a. have visible bruises—in several cases a black eye—at the time of her check-in;

 b. rent rooms under her real name, using her real identification;

 c. pay rent day-to-day or a few days at time throughout the stay;

 d. frequently request rooms in the back of the properties;

 e. request fresh linens from hotel staff each day;

 f. dispose of the used condoms in the hotel trash cans and toilets (wrappers always went in the trash); and

 g. except for rare occasions when Delquan handled the ads from his base in Las Vegas, post ads on websites known for facilitating commercial sex using the hotel's wifi.

101.    At each of these locations, McKenzie would average between five and ten "in calls" per day.  There was therefore a regular flow of men who were not guests of the hotels going in and out of McKenzie's room every day she was at these hotels.

102.    McKenzie usually met johns in the hotel lobby or by the elevators to ensure they got in, to make them feel secure, and to walk them up to her room.  Each time she did this, she was transparently dressed for sex work.

DEAVER | CRAFTON
ATTORNEYS AT LAW

103.    At hotels with exterior room doors, McKenzie would wait for johns in her room. However, the Sugarhouse ESA, the SLC Red Lion, and the Downtown Quality Inn all had interior lobbies, so the front desk employees at all four hotels watched on numerous occasions as McKenzie met johns to lead them up to her room.  They also watched those johns come back down an hour or two later without her, after which the pattern would usually repeat several more times.

104.    During these out-of-state stays, McKenzie would transfer her earnings to Delquan every day via Walmart-to-Walmart payments. Eventually, apparently tired of the $9.50 service charge with each transaction, Delquan began making McKenzie deposit the money directly into his bank account.

105.    A number of close calls that put her safety in danger eventually pushed McKenzie past her breaking point. McKenzie had a breakdown and recognized that her death would be imminent—and her children would no longer have a mother—if she didn't get out somehow. McKenzie contacted her own mother and ran to stay with her, bringing only the clothes on her back.  She never got her belongings back, let alone any of the money Delquan took from her.

106.    McKenzie was successful in her escape from Delquan, but her trauma remains.

**The Franchisor Defendants' Control Over their Franchisees' Conduct**

*The Downtown Quality Inn*

107.    Based on the Quality Inn Disclosure Document ("FDD") for the year 2016, the operative franchise agreements between CRRC and Salt Lake Lodging on the one hand and Choice on the other provided:

> h.    CRRC/Salt Lake Lodging must purchase all signage, uniforms, furniture, linens, interior design elements, and electronic equipment from a limited selection of Approved Vendors selling a limited selection of Choice-designed and/or -approved products.

i. CRRC/Salt Lake Lodging must put their proposed general manager(s) through a lengthy Choice-run and Choice-evaluated manager training program, which the general manager(s) must complete to Choice's satisfaction—effectively giving Choice total discretionary control over the management of CRRC/Salt Lake Lodging' hotel location.

j. CRRC/Salt Lake Lodging must put all general managers, assistant general managers, front office managers, and front desk staff through Choice-run and Choice-evaluated training.

i. CRRC/Salt Lake Lodging employees must complete these trainings and related evaluations to Choice's satisfaction, effectively giving Choice discretionary control over the employment of all front desk staff at the Downtown Quality Inn.

ii. By assigning specific trainings to specific job titles, Days Inn effectively mandates that CRRC/Salt Lake Lodging adopt Days Inn's preferred scheme of job titles and responsibilities.

k. CRRC/Salt Lake Lodging must use the "full functionality" of Choice's proprietary Central Reservation System, which interfaces with Choice's proprietary property management system.

l. CRRC/Salt Lake Lodging must use the "full functionality" of Choice's proprietary property management system, called "choiceADVANTAGE."

i. Choice "will have independent access to the information that will be generated by the choiceADVANTAGE property management system and will use the information and data to identify trends."

ii. On information and belief, Choice used the information and data stored in the choiceADVANTAGE system by the Downtown Quality Inn to identify several trends indicating it was a hotbed for human trafficking, including excessive requests for fresh linens, unusually frequent plumbing expenses due to flushed condoms, excessive cash payments, and staff notes suggesting guests were being trafficked.

m. CRRC/Salt Lake Lodging may use Choice's proprietary choiceRM revenue management system, which "calculates and suggests optimum rates based on each hotel's past performance and projected occupancy." On information and belief, both CRRC and Salt Lake Lodging opted into this system.

n. Choice monitors the "compliance of existing franchisees . . . through scheduled and unannounced quality assurance reviews."

i. Franchisees that fail inspections may be required to pay for re-inspection or face other consequences.

ii. Such consequences "are determined in [Choice]'s discretion on a case-by-case basis and may take into account a variety of factors apart from a franchisee's level of compliance with [Choice]'s quality standards and brand specifications."

      iii.  In other words, Choice had almost unfettered discretion to order the Downtown Quality Inn to alter its operations based on inspections, whether or not such alteration was needed to meet brand standards.

o.  CRRC/Salt Lake Lodging must "participate in . . . all required guest complaint resolution programs and ratings and review policies."

      i.  Other hotels with guest complaint resolution programs generally require franchisees to closely monitor all online reviews of their hotel locations and respond directly to negative reviews, with compliance enforced by the franchisor's independent monitoring of the same reviews

      ii.  Although the contours of Choice's guest complaint resolution program as of 2014-2016 are not public, on information and belief it operated in the same fashion as other franchisor's similar programs described in the preceding sub-paragraph.

p.  CRRC/Salt Lake Lodging must additionally comply with the much more detailed brand standards not contained in the FDD. These requirements are in CRRC/Salt Lake Lodging and Choice's exclusive knowledge, but upon information and belief they include:

      i.  Specific requirements that CRRC/Salt Lake Lodging record and inform Choice of evidence of criminal activity, particularly evidence indicative of sex trafficking like excessive used condoms left behind, excessive requests for linens, and excessive foot traffic to particular rooms.

      ii.  Suggested pay rates and terms of employment for each job title defined by Choice in its training program.

108.    On information and belief, CRRC/Salt Lake Lodging jointly performed their above-specified duties under the operative franchise agreement in full, and Choice exercised its above-specified rights to access information and to direct the operations of the Downtown Quality Inn in full.

109.    Additionally, there are several public-facing reviews of the Downtown Quality Inn—operated by Defendants CRCC and Salt Lake Lodging and franchised by Defendant Choice—which mention the prevalence of prostitution on the property, including the following:

q.  One guest awarded one out of five stars, stating "the hotel was dirty and I am certain that at least twice I encountered prostitutes in the hallways or parking lot."

r.  Another guest awarded two out of five stars, stating, "I wasn't expecting hourly hookers to be roaming around."

s.      Another guest awarded two out of five stars, stating, "Unsafe and horrible experience Homeless hangout and prostitution everywhere."

t.      Another guest awarded one out of five stars because of the, "Possible prostitution ring being operated here. Very seedy characters going in and out from the front parking lot to a room. Also a young girl in revealing clothing hanging out in front going in and out of the 'hotel' with other sketchy people. . . . Stains on the box spring of the mattress, also found a 'male enhancement package' under the mattress.  (As if the prostitution wasn't already obvious)  They might as well put "Brothel" on the sign or maybe Name it the "we have no quality inn. . . . Do yourself a favor and spend the extra $100 and stay in an actual hotel, not this dump it is a haven for criminal activity posing as a legitimate business.

110.    Although only the first of the above-quoted reviews was left during McKenzie's trafficking, it is likely that other, earlier reviews also mentioned the prevalence of prostitution at the Downtown Quality Inn, and that those reviews have been removed or become inaccessible due to the passage of time.

111.    On information and belief, numerous reviews mentioning the prevalence of prostitution were visible to—and seen by—Defendants CRCC, Salt Lake Lodging, and Choice before and during McKenzie's trafficking.

*The SLC Red Lion*

112.    Based on the Red Lion Franchise Disclosure Document ("FDD") for the year 2015, the operative franchise agreements between WHC and RL SLC on the one hand and Red Lion on the other provided:

u.      WHC/RL SLC must purchase all signage, uniforms, furniture, linens, interior design elements, and electronic equipment from a limited selection of Approved Vendors selling a limited selection of Red Lion-designed and/or -approved products.

v.      WHC/RL SLC must put their proposed general manager(s) through a lengthy Red Lion-run and Red Lion-evaluated manager training program, which the general manager(s) must complete to Red Lion's satisfaction—effectively giving Red Lion total discretionary control over the management of WHC/RL SLC' hotel location.

w.      WHC/RL SLC must put all employees through a set of Red Lion-created trainings that depends on each employee's job title, but that for all managers includes CPR training and "Risk & Emergency Training".

    i. WHC/RL SLC employees must complete these trainings and related evaluations to Red Lion's satisfaction, effectively giving Red Lion discretionary control over all employment decisions at the SLC Red Lion.

    ii. By assigning specific trainings to specific job titles, Days Inn effectively mandates that WHC/RL SLC adopt Days Inn's preferred scheme of job titles and responsibilities.

 x. WHC/RL SLC must use Red Lion's proprietary Central Reservation System as its sole method for arranging/selling room reservations.

    i. This Central Reservation System "collects and generates business information . . . including guests' names, addresses, payment information, and other personal information."

    ii. Red Lion "will have independent access to this information and data" and their "access to this information and data is not contractually limited."

    iii. In other words, Red Lion knew every piece of information that anyone at the SLC Red Lion entered into the Central Reservation System.

 y. WHC/RL SLC must use Red Lion's sole approved Property Management Software which: interfaces with the Reservation System; records room reservation traffic, occupancy rate information, and pricing information; and transmits this information to Red Lion nightly.

 z. WHC/RL SLC must use Red Lion's exclusive credit card processing system.

 aa. WHC/RL SLC must use Red Lion's Customer Relationship Management system, which stores centralized guest profiles and provides for pre- and post-stay messaging, data mining, and loyalty management.

    i. On information and belief, this system enables staff to save notes about individual guests.

    ii. On information and belief, the SLC Red Lion's employees saved several notes on McKenzie's profile recording Ryan Smith's belief that she was a sex worker with an abusive pimp.

    iii. Red Lion had access to this centralized system, so it knew all information that was recorded in the SLC Red Lion's notes.

 bb. WHC/RL SLC must use Red Lion's proprietary Revenue Management System, which provides "automated revenue strategy"—i.e. sets algorithmically determined room prices—for franchised hotels like the SLC Red Lion.

 cc. Red Lion may conduct "periodic inspections of the Hotel and guest satisfaction surveys and audits . . . with or without prior notice." Based on the results of such inspections, Red Lion may, in its "sole discretion"

enforce "the System standards as we deem necessary or appropriate in furtherance of our interests."

dd.    Red Lion may—and, on information and belief, did—monitor third-party review websites for negative reviews of the SLC Red Lion through its central Reputation Management Service.

ee.    WHC/RL SLC use a specified vendor for guest wireless internet access services.

    i.    On information and belief, this gave Red Lion unfettered access to all guest internet usage records, including the full list of websites visited by persons associated with each individual reservation.

    ii.    Thus, each time someone (such as McKenzie) posted a new advert to a website like megapersonals or Backpage.com, Red Lion knew, and it chose not to interfere.

ff.    WHC/RL SLC must additionally comply with the much more detailed brand standards laid out in the (confidential) operating and Brand Standards Manual. These requirements are in WHC/RL SLC and Red Lion's exclusive knowledge, but upon information and belief they include:

    i.    Specific requirements that WHC/RL SLC record and inform Red Lion of evidence of criminal activity, particularly evidence indicative of sex trafficking like excessive used condoms left behind, excessive requests for linens, and excessive foot traffic to particular rooms.

    ii.    Suggested pay rates and terms of employment for each job title defined by Red Lion in its training program.

113.    On information and belief, WHC/RL SLC jointly performed their above-specified duties under the operative franchise agreement in full, and Red Lion exercised its above-specified rights to access information and to direct the operations of WHC/RL SLC's hotel location in full.

114.    Relevant online reviews of the SLC Red Lion include:

gg.    One guest awarded one out of five stars, asking other prospective guests to consider, "Do you want to hear drug dealers at the biker bar" beneath the hotel's guest rooms "fighting with what appear to be hookers?"

hh.    Another guest awarded one out of five stars, complaining about "the friggin weirdo people lurking around inside and outside" that led him to conclude "there is drug dealing and prostitution going on around this hotel."

115.    Although the above reviews were left, respectively, one and two years after the

end of McKenzie's trafficking, it is likely that other, earlier reviews also mentioned the prevalence of prostitution at the Downtown Quality Inn, and that those reviews have been removed or become inaccessible due to the passage of time and/or due to takedown requests by (in the alternative) WHC, RL SLC, and/or Red Lion.

116.    Both of the above reviews come from Yelp.  Unlike other review sites, Yelp does not enable business owners to entirely remove unfavorable reviews.  Instead, they can only have such reviews deemed "not currently recommended" and excluded from the ratings average.

117.    Both of the above reviews had been deemed "not currently recommended" based on demands from (in the alternative) WHC, RL SLC, and/or Red Lion.  It is therefore virtually certain that WHC, RL SLC, and/or Red Lion caused the removal of similar reviews mentioning prostitution from other review sites that maintain less transparency than Yelp.

118.    On information and belief, numerous reviews mentioning the prevalence of prostitution were visible to—and seen by—Defendants ESA, ESA Operating, and ESA Portfolio before and during McKenzie's trafficking.

*The Sugarhouse ESA*

119.    As stated in the Parties section, *supra*, ESA Portfolio—or, in the alternative, ESA Operating—operated the Sugarhouse ESA as the alter ego of the putative franchisor ESA.

120.    In the alternative, ESA Portfolio or ESA Operating operated the Sugarhouse ESA pursuant to a standard ESA franchising agreement.  Based on the ESH Strategies Franchise, LLC. ("ESH") Franchise Disclosure Document ("FDD") for the year 2017, the operative franchise agreement between ESH and ESA Portfolio (or, in the alternative, between ESH and ESA Operating) provided:

        ii.    ESA Portfolio/Operating must purchase all signage, linens, interior design elements, and electronic equipment from a limited selection of Approved

Suppliers selling a limited selection of Extended Stay-designed and/or -approved products.

jj.  ESA Portfolio/Operating must either use an ESH-approved third-party management company or else put its proposed general manager(s) through a lengthy ESH-run and ESH-evaluated manager training program, which the general manager(s) must complete to ESH's satisfaction.

kk.  ESA Portfolio/Operating must participate in and use ESH's designated Reservation Service as its method for arranging/selling room reservations electronically. This Reservation Service "means the voice, internet, and other systems and related services that [ESH] uses to book reservations for System Hotels on a centralized basis."

ll.  ESA Portfolio/Operating must "purchase, use, and maintain property management, revenue management, telephone and telecommunication, and high-speed internet systems, and other technology systems that [ESH] deem[s] to be in the best interests of [ESH]."

mm.  ESH has the right to enter and inspect the Hotel and related operations, books, records, accounts, and systems without notice to ESA Portfolio/Operating as a part of ESH's Quality Assurance Program.

nn.  ESH exclusively owns all of ESA Portfolio/Operating's "Data" and "Guest Data."

   i.  Data includes, but is not limited to, Operating Revenue and reservation data.

   ii.  Guest Data refers to the following information: guests' personally identifiable information (their name, birthdate, mailing addresses, phone numbers, and email addresses); information about their consumer preferences; stay and aggregated information; and other similar or related information.

oo.  ESA Portfolio/Operating must additionally comply with the much more detailed brand standards laid out in the (confidential) Brand Standards document. These requirements are in ESA Portfolio/Operating and ESH's exclusive knowledge, but upon information and belief they include:

   i.  Specific requirements that ESA Portfolio/Operating record and inform ESH of evidence of criminal activity, particularly evidence indicative of sex trafficking like excessive used condoms left behind, excessive requests for linens, and excessive foot traffic to particular rooms.

   ii.  Sex trafficking awareness training requirements.

   iii.  Suggested pay rates and terms of employment for each job title defined by ESH in its training program.

   iv.  A requirement that ESA Portfolio/Operating use a specified vendor for guest wireless internet access services, thereby giving ESH unfettered access to all guest internet usage records, including the

full list of websites visited by persons associated with each individual reservation.

v. Based on subsequent ESH FDD's, particularly the 2021 FDD, it is likely that in 2015 and 2016, ESH's brand standards contained a term requiring ESA Portfolio/Operating to "acknowledge[] that [ESH] or a third-party provider may monitor and review stored data and other files without restriction." Thus, ESH had the ultimate right to independently access ESA Portfolio/Operating's databases, particularly the property management system, which takes reservations, assigns rooms at check-in, tracks room charges and activity, records accounts receivable, prints housekeeping and financial reports, and scans drivers' licenses, as well as recording notes about guests as "Stay Remarks."

1. As a result, ESH had access to detailed about ESA Portfolio/Operating's operations, including the ratio of rooms rented online versus in-person at the hotel's front desk and the amounts expended on additional linens and other cleaning and maintenance services likely to be linked to human trafficking.

2. Given the nature of the ESA Portfolio/Operating's clientele, ESH likely also had access to Stay Remarks recording instances of pimping (i.e. trafficking) and other crimes at the Extended Stay. On information and belief, it had access to at least one Stay Remark recording suspicions that McKenzie was being pimped (trafficked) by Delquan or his cousin.

121. On information and belief, ESA Portfolio—or, in the alternative, ESA Operating—performed its above-specified duties under the operative franchise agreement in full, and ESH exercised its above-specified rights to access information and to direct the management of the Sugarhouse ESA in full.

122. One relevant online review of the Sugarhouse ESA gave the hotel one out of five stars and complained about how "there are apparently construction workers staying here with their 'girlfriends' who look suspiciously like ladies of the night and squabbles are RAMPANT right on the catwalks in front of the rooms."

123. Although the above review was left several months after the end of McKenzie's trafficking, it is likely that other, earlier reviews also mentioned the prevalence of prostitution at the Downtown Quality Inn, and that those reviews have been removed or become inaccessible

1  due to the passage of time.

2      124.    On information and belief, numerous reviews mentioning the prevalence of

3  prostitution were visible to—and seen by—Defendants ESA, ESA Operating, and ESA Portfolio

4  before and during McKenzie's trafficking.

5      125.    It is a standard practice in the hospitality industry for franchisors to monitor all

6  guest reviews and complaints on online platforms, and for franchisors to charge franchisees a fee

7  if they fail to respond promptly to a negative review.  On information and belief, ESA, Red Lion,

8  and Choice each incorporated this general practice into their operative franchise agreements with

9  the Hotel Operator Defendants and/or their incorporated brand standards covering the relevant

10  period.

11      126.    ESA and Choice knew, throughout the relevant period, that their franchise

12  locations played host to at least thousands and likely many tens of thousands of instances of sex

13  trafficking each year.  Red Lion knew, throughout the relevant period, that its franchise locations

14  played host to hundreds and likely thousands of instances of sex trafficking each year.

15                 COUNT I: 18 U.S.C. § 1595 ("TVPRA")

16      127.    Plaintiff incorporates each foregoing and subsequent allegation.

17      128.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a)

18  and is entitled to bring a civil action under 18 U.S.C. §1595.

19      129.    Through their acts and omissions described above, the Hotel Operator Defendants

20  and the Hotel Franchisor Defendants are each "perpetrator[s]" of Plaintiff's sex trafficking within

21  the meaning of 18 U.S.C. § 1591(a), and they are thus liable under 18 U.S.C. § 1595.

22      130.    More specifically, the Hotel Operator Defendants and the Hotel Franchisor

23  Defendants each "harbor[ed]" and "maintain[ed]" Plaintiff within the meaning of § 1591(a), and

24

1    additionally "provide[d]" Plaintiff.

2        131.    Through their acts and omissions described above, the Hotel Operator Defendants

3    and the Hotel Franchisor Defendants each benefit[ted] financially from Plaintiff's sex trafficking

4    due to their participation in a venture that they knew or should have known earned money from

5    sex trafficking, and they are thus liable under 18 U.S.C. § 1595.

6        132.    The Hotel Operator Defendants each participated in the "venture" of operating

7    their respective hotel when they knew or should have known that their hotel had engaged in

8    violations of § 1591.

9        133.    Similarly, the Hotel Franchisor Defendants participated in the "venture" of their

10   franchisor-franchisee relationship when they knew or should have known that the relationship

11   had engaged in violations of § 1591.

12       134.    Plaintiff is therefore entitled to bring an action against each Defendant for damages

13   under 18 U.S.C. § 1595.

14       135.    Defendant ESA is liable as the alter ego of ESA Operating and ESA Portfolio.

15       136.    Defendant Sonesta is liable because it assumed the liabilities of Red Lion.

16              **COUNT II: UTAH CODE 77-38-15 (NOW UTAH CODE 78B-3-113)**

17       137.    Plaintiff incorporates each foregoing and subsequent allegation.

18       138.    Plaintiff is a victim of a person that committed human trafficking within the

19   meaning of Utah Code 77-38-15 (subsequently renumbered to Utah Code 78B-3-113).

20       139.    Through their actions described above, Defendants ESA Operating, ESA

21   Portfolio, WHC, RL SLC, CRCC, Salt Lake Lodging, Red Lion, and Choice committed human

22   trafficking for sexual exploitation within the meaning of Utah Code 76-5-308.1.

23       140.    Plaintiff is therefore entitled to bring an action against the listed Defendants under

24

Utah Code 77-38-15.

141.    Defendant ESA is liable as the alter ego of ESA Operating and ESA Portfolio.

142.    Defendant Sonesta is liable because it assumed the liabilities of Red Lion.

### ALLEGATIONS REGARDING EQUITABLE TOLLING

143.    Plaintiff diligently filed a lawsuit in Nevada state court against the above-named defendants in 2024, within the applicable statute of limitations.  This case was removed to federal court in the United States District Court for the District of Nevada.

144.    To the extent necessary, Plaintiff pleads that her statute of limitations is subject to equitable tolling.

145.    Plaintiff had a good-faith basis for believing that Defendants were subject to personal jurisdiction in Nevada.

146.    At the time, Plaintiff believed Nevada's federal Courts would find consent to jurisdiction by appointment of a registered agent sufficient per Mallory v. Norfolk Southern Railway Co., 600 U.S. 122 (2023).

147.    As a backup theory, Plaintiff was prepared, if necessary, to assert on a good-faith basis that the TVPRA allows for nationwide service of process.

148.    Other Defendants in the Nevada suit eventually consented to personal jurisdiction in that State to promote convenience and efficiency, which would have allowed all the potential Defendants to be tried in one suit.

149.    Plaintiff's trafficker was being criminally prosecuted during the pendency of her Nevada suit, however.  Under 15 U.S.C. 1595(b)(1), her civil case was not allowed to make any progress while the criminal prosecution was ongoing.

150.    While her case was stayed, the U.S. District Court for the District of Nevada

1    rejected Plaintiff's consent by registration theory in another case.

2    151.    After several discussions with counsel for the various Defendants in the Nevada

3    suit, Plaintiff asked the Court to sever and transfer some of the claims to this Court, to fix the

4    potential personal jurisdiction and venue issues that had now arisen.

5    152.    The District of Nevada, rather than grant the motion to sever and transfer,

6    dismissed Plaintiff's claims against the Utah Defendants without prejudice and instructed her to

7    refile in another District.

8    153.    Plaintiff diligently sought to preserve her statute of limitations, but if she did not

9    do so, equitable tolling applies.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.    Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; and all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.    Disgorgement of profits and/or restitution;

c.    Punitive damages, attorneys' fees, and expenses;

d.    The costs of this action;

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

e.  Pre- and post-judgment interest; and

f.  Any other relief the Court or jury deems appropriate.

DATED this 21st day of July, 2025.

**DEAVER|CRAFTON**

*/s/ Colton J. Wilstead*
COLTON J. WILSTEAD, ESQ.
Utah Bar No. 18254
150 N. 200 E., STE. 100
St. George, UT 84770

GEOFFREY C. PARKER, ESQ.
Nevada Bar No. 16952
JONATHAN L. HILTON, ESQ.
Nevada Bar No. 16889
**HILTON PARKER LLC**
Ohio Bar No. 0096049
7658 Slate Ridge Boulevard
Reynoldsburg, Ohio 43068
*Pro hac vice to be filed*

MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857
JOEL S. HENGSTLER, ESQ.
Nevada Bar No. 11597
**THE702FIRM INJURY ATTORNEYS**
400 South 7th Street, Suite 400
Las Vegas, Nevada  89101
*Pro hac vice to be filed*

*Attorneys for Plaintiff McKenzie Keller*

## DEMAND FOR JURY TRIAL

Plaintiff McKenzie Keller, by and through her attorneys of record, hereby demands a jury trial of all issues in the above matter.

DATED this 21st day of July, 2025.

**DEAVER|CRAFTON**

*/s/ Colton J. Wilstead*
COLTON J. WILSTEAD, ESQ.
Utah Bar No. 18254
150 N. 200 E., STE. 100
St. George, UT 84770

GEOFFREY C. PARKER, ESQ.
Nevada Bar No. 16952
JONATHAN L. HILTON, ESQ.
Nevada Bar No. 16889
**HILTON PARKER LLC**
Ohio Bar No. 0096049
7658 Slate Ridge Boulevard
Reynoldsburg, Ohio 43068
*Pro hac vice to be filed*

MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857
JOEL S. HENGSTLER, ESQ.
Nevada Bar No. 11597
**THE702FIRM INJURY ATTORNEYS**
400 South 7th Street, Suite 400
Las Vegas, Nevada  89101
*Pro hac vice to be filed*

*Attorneys for Plaintiff McKenzie Keller*